## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **M. Brunner and J. Fry,** | : | |
| **individually and on behalf of all others** | : | |
| **similarly situated,** | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 1:25-cv-3244** |
| | : | |
| **vs.** | : | <u>**CLASS ACTION COMPLAINT**</u> |
| | : | |
| **Fenix Internet, LLC** | : | **JURY TRIAL DEMANDED** |
| 2598 E. Sunrise Blvd, Suite 2104 | : | |
| Fort Lauderdale, FL 33304 | : | |
| | : | |
| **and** | : | |
| | : | |
| **Fenix International Limited** | : | |
| Ninth Floor 107 Cheapside, | : | |
| London, United Kingdom, | : | |
| EC2V 6DN | : | |
| | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

Plaintiffs M. Brunner and J. Fry ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Fenix International Limited ("OnlyFans") and Fenix Internet, LLC (together "OnlyFans" or the "OnlyFans Defendants") and allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief.

## I.    <u>INTRODUCTION</u>

1.    Founded in 2016, OnlyFans runs a subscription-based social media platform that has grown exponentially in recent years. OnlyFans claims that it is centered around "authentic connections," and sets itself apart from other social media platforms and content-based websites

on this basis. In stating its mission, for example, OnlyFans claims that it "empower[s] creators to own their full potential, monetize their content, and develop authentic connections with their fans."[1] Further, OnlyFans "giv[es] creators control to own and monetize their content and to grow their fanbase," and OnlyFans "take[s] responsibility for our words and actions and own [its] results."[2]

2.      To further this mission, OnlyFans invites users to create an OnlyFans account, subscribe to creators' accounts, and pay to access exclusive content through those subscriptions, including paying to direct message ("DM") creators and paying creators for bespoke personalized content.[3]

3.      OnlyFans, whose popularity has grown rapidly since 2020, disclosed in its 2023 Annual Report and Consolidated Financial Statements that is has over 300 million users (fan accounts) ("Fans") and had paid out over approximately $4.3 billion dollars to its content creators ("Creators").[4] While the site's growth and reputation has been fueled largely by its adult content, OnlyFans also hosts, and profits from, a variety of Creators and their content.

4.      Since launching, OnlyFans has earned a reputation as a reliable source of income—ranging from supplemental income to highly lucrative income—for many of the over 4 million

---

[1] OnlyFans, *Who We Are*, Only Fans About Page, https://onlyfans.com/about (last visited March 25, 2025).
[2] OnlyFans, *Our Mission, Vision and Values*, OnlyFans Mission, Vision, and Values Page, https://onlyfans.com/values (last visited March 25, 2025).
[3] A direct message is a message exchanged between a Creator account and a Fan account through the OnlyFans platform. Direct messages include exchanging text-based messages, videos, pictures, and voice messages, among other content where a Fan account and Creator account are in direct communication with each other.
[4] Fenix International Limited, *Fenix International Limited Annual Report and Financial Statements for the Year Ended 30 Nov. 2023*, 3 (Nov. 30, 2023), https://find-and-update.company-information.service.gov.uk/company/10354575/filing-history (last visited March 25, 2025).

Creators who choose OnlyFans as the venue to monetize their content.[5]

5.     OnlyFans retains 20% of the revenue that Fans pay to access Creators' content, including payments for subscriptions, exclusive content, and monetary tips sent by Fans to access direct messages or other content.[6] OnlyFans' revenue is thus directly proportional to the *volume* (not the quality) of Creator-specific subscriptions and exclusive content that Fans purchase.

6.     Perhaps unsurprisingly, then, despite the fact that OnlyFans' success is built on a promise of "direct" connections and "authentic" relationships, OnlyFans knowingly facilitates schemes in which Fans are duped into paying to have personal interactions with Creators that are not "authentic" at all. These schemes involve the deceptive outsourcing of the job of interacting with Fans, as well as other functions, to third-party "management" agencies.

7.     According to industry insiders, "OnlyFans-focused management companies" sometimes "hire account managers to pretend to be the models—including when sexting fans."[7] For instance, the Unruly Agency "has a hidden army of 'account managers' who spend much of their days ghostwriting responses to messages that fans pay to send some influencers."[8] Two "former Unruly staffers allege[d] that fans divulge their 'deepest and innermost personal secrets including sexual fantasies and fetishes' thinking they are chatting with the influencers."[9]

---

[5] As of year-end 2023, OnlyFans had approximately 4.1 million Creators. Social Rise, *OnlyFans Statistics: Users, Creators, Revenue, and More*, Social Rise (Dec. 15, 2024), https://social-rise.com/blog/onlyfans-statistics#:~:text=ask%20for%20tips.-,How%20many%20OnlyFans%20accounts%20are%20there%3F,official%20numbers%20on%20active%20accounts.

[6] OnlyFans, *Help: Payout Percentages*, OnlyFans Community Guidelines, https://onlyfans.com/help/196/197/287 (last visited March 25, 2025).

[7] Amanda Perelli, *The Secret Lives of OnlyFans Ghostwriters, Who Say Their Job Includes Catfishing Paying Fans*, Business Insider (Dec. 20, 2021), https://www.businessinsider.com/inside-secret-lives-onlyfans-ghostwriters-catfish-fans-2021-12.

[8] *Id.*

[9] *Id*.

8.      Thus, while OnlyFans encourages Creators to engage in direct messaging with their Fans, and even states in a blog with tips to build a Creator's fanbase that "[m]any successful creators carve out time just to interact with fans – writing and responding to DMs,"[10] many Fans who pay to receive personal messages from Creators in fact receive messages from third-party companies—strangers—*posing* as the Creators.

9.      Upon information and belief, OnlyFans knows about these arrangements between Creators and third-party companies. But instead of curtailing these practices, OnlyFans facilitates the continued deception of its Fans.

10.      Not only are Fans harmed by this deception, but Creators are, too. Since OnlyFans holds its platform out as a place for authentic relationships, those Creators that use the platform as promised face a potential harm as Fans may begin to shy away from the site as the practice becomes better known, uncertain as to whether they are actually engaging in the authentic communications they paid to receive.

11.      Meanwhile, OnlyFans knows or has reason to know that its highest-earning Creators engage third-party companies to interact with Fans, but deceptively continues to hold itself out to users as a platform for building "authentic relationships"—duping Fans into believing that they are interacting with the Creators themselves. As one Creator put it, "My fans aren't paying for porn. They're paying to have a personal experience, one-on-one[.]"[11]

12.      OnlyFans profits from these deceptive arrangements with third-party companies by promoting direct messages, pay-per-view messages, and the "tip" feature it makes available on its

---

[10] OnlyFans Editor, *How to Build Your Fanbase on OnlyFans*, OnlyFans Blog (May 13, 2024), https://blog.onlyfans.com/build-your-fanbase-on-onlyfans/.

[11] Sirin Kale, *OnlyFans: a day in the life of a top(less) creator*, The Economist: 1843 Magazine (Jan. 6, 2020), https://www.1843magazine.com/people/onlyfans-a-day-in-the-life-of-a-topless-creator (internal quotation marks omitted).

platform, and taking its 20% cut on every transaction. OnlyFans induces Fans to pay for Creators' exclusive content by selling the illusion of intimacy and the false promise that the actual Creator may become aware of and be interested in the actual Fan.

13.     As OnlyFans previously explained to Creators on its website, "[t]he more you interact with your fans on a personal level through messaging, the more likely they are to show their appreciation by tipping you."[12] Indeed, OnlyFans explained that "[y]ou may be surprised at how many fans will pay *just to interact with you*."[13]

14.     Similarly, as to pay-per-view ("PPV") content, OnlyFans has explained: "A paid message contains content hidden behind a paywall that your fans pay to unlock. This feature is one of the most popular ways to make money on OnlyFans and is available for all accounts on the platform—free or paid."[14]

15.     OnlyFans instructs Creators on how to sell the illusion of intimacy. For example, in an article on its website directed to Creators about how to maximize PPV earnings, OnlyFans has explained: "As long as your fans feel like you're offering a sincere invitation to connect with you and your most exclusive content over PPV, they'll feel your PPVs were money well spent."[15]

16.     OnlyFans further promotes the illusion of intimacy through the Creators it features

---

[12]     Alex, *Using Messages on OnlyFans*, OnlyFans Blog (Aug. 25, 2021), https://blog.onlyfans.com/using-messages-on-onlyfans/, [https://web.archive.org/web/20220422181918/https://blog.onlyfans.com/using-messages-on-onlyfans/] (last visited March 25, 2025).

[13] *Id.* (emphasis added).

[14] *Id.* In addition to paid DMs, Fans can also pay to unlock content posted on a Creator's account feed. For purposes of this Complaint, "PPV" refers to any content other than content that is available to all subscribers to a Creator's page without additional fees.

[15]     Alex, *How to Use PPVs Like a Pro*, OnlyFans Blog (Apr. 22, 2022), https://blog.onlyfans.com/how-to-use-ppvs-on-onlyfans [https://web.archive.org/web/20221002061728/https://blog.onlyfans.com/how-to-use-ppvs-like-a-pro/] (last visited March 25, 2025).

on its website. For example, one Creator featured on the OnlyFans blog explained: "[t]he best part is connecting with people from all over the world on a more intimate level, rather than just commenting on an Instagram post."[16]

17.     Another Creator that OnlyFans featured similarly explained, "OnlyFans has given me the ability to really get to know my fans one on one. I chat with them every day, and it's something I truly enjoy."[17] As another Creator puts it "[t]he fans are what makes this platform go round and I love that I can engage and connect with my fans. We all crave human connection and I think it's important to interact with each other."[18] More recently, another Creator featured by OnlyFans stated that she loved the experience of being live with fans because of "[t]he personal feel it gives me between myself, my audience, my followers, the people who have grown to love me. Being able to exchange conversations with them, almost like it's real life, is something that I love."[19]

18.     OnlyFans promotes the idea of direct communication and relationships beyond the adult themed content. As one featured Creator put it: "the way that OnlyFans brings fans and athletes closer together is amazing too."[20] Another recently featured Creator in the sports world said, "I just want to say, thank you for all the messages! My fans are so receptive and so wonderful

---

[16]     AK, *There's More to Harry Jowsey*, OnlyFans Blog (Dec. 19, 2022), https://blog.onlyfans.com/theres-more-to-harry-jowsey/ (last visited March 25, 2025).

[17]     AK, *How Sophie Kasaei Approaches OnlyFans*, OnlyFans Blog (Mar. 20, 2023), https://blog.onlyfans.com/sophie-kasaei-approaches-onlyfans/.

[18]     AK, *Jamie Colleen Miller is Unstoppable*, OnlyFans Blog (Mar. 1, 2023), https://blog.onlyfans.com/jamie-colleen-miller/.

[19]     Features Editor, *Going Live with Lauren Alexis*, OnlyFans Blog (Oct. 25, 2024), https://blog.onlyfans.com/lauren-alexis/.

[20]     AK, *Stefan Garlicki Finds Freedom on OnlyFans*, OnlyFans Blog (Mar. 15, 2023), https://blog.onlyfans.com/stefan-garlicki-finds-freedom/.

to me. And I love how people know me now. It's crazy."[21]

19.    Despite this, OnlyFans does not honor its publicly stated mission of fostering "authentic relationships" in practice, especially when it comes to its highest-earning Creators. Instead, it continues to promote itself as a platform for direct relationships between Creators and Fans—while simultaneously facilitating and profiting from the deception of its Fans through third-party companies posing as Creators.

20.    In fact, while the OnlyFans Terms of Service require that Creators accurately describe their content,[22] OnlyFans does not enforce this requirement when it comes to the core feature of OnlyFans' site: that it purportedly allows Fans to interact directly with the Creators that they follow—not third parties posing as those Creators. Indeed, the Terms of Service contain provisions that would allow OnlyFans to withhold Creator earnings and return them to Fans based on serious or repeat breach of its terms,[23] but OnlyFans chooses not to employ this provision to protect its Fans from deceptive conduct.

21.    Though OnlyFans outwardly sells authenticity, and promises its Fans "very robust content moderation,"[24] behind the curtains it aids its highest-earning Creators in defrauding Fans, amasses significant profits in doing so, and fails to implement any controls against this misconduct. OnlyFans lines its pockets by allowing and encouraging the misconduct of its most successful Creators.

---

[21] Sports Editor, *Amanda Ribas: Outside the Cage*, OnlyFans Blog (January 25, 2024), https://blog.onlyfans.com/amanda-ribas/.
[22] OnlyFans, *Terms of Service Content – general terms*, § 8(c)(iv)(1-3), OnlyFans Terms of Service (August 2024), https://onlyfans.com/terms. Attached as **Exhibit A**.
[23] *Id.* § 14(b).
[24] Raisa Bruner, *OnlyFans CEO Ami Gan Wants to Dispel Misconceptions About the Company*, Time: The Leadership Brief (July 31, 2022), https://time.com/6202306/onlyfans-ceo-ami-gan-interview/.

## II.     JURISDICTION

22.     This Court has subject matter jurisdiction over this action based on the parties'

diversity of citizenship under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is

a class action involving more than one hundred (100) putative Class Members, the amount in

controversy exceeds $5 million dollars, exclusive of interests and costs, and at least one Class

Member is a citizen of a different state than Defendants' state.

23.     This Court has personal jurisdiction over Plaintiffs because they are residents of

Illinois.

24.     This Court has personal jurisdiction over Defendants because (i) Defendants

regularly conduct business or solicit business, engage in other persistent courses of conduct and/or

derive substantial revenue from products and/or services provided to individuals in the District and

in this State; and (ii) Defendants have purposefully established substantial, systematic, and

continuous contacts with this District and expect or reasonably should expect to be hauled into

court here. Thus, Defendants have sufficient minimum contacts with this District, and this Court's

exercise of jurisdiction over Defendants will not offend traditional notions of fair play and

substantial justice. Exercise of jurisdiction by this Court is just and proper because Defendants,

through their business operations, intentionally availed themselves of the markets within this

District.

## III.     VENUE

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants

regularly do business in this District and are subject to personal jurisdiction in this District.

26.     Venue is not proper in England or Wales, and English law should not apply,

notwithstanding OnlyFans' Terms of Service ("TOS"), attached hereto as **Exhibit A**, which

contains a provision purporting to allow the Courts in those countries to exercise jurisdiction.[25]

27.     Plaintiffs' claims arise primarily out of Defendants' misleading, unlawful conduct, alleged herein, and are brought on behalf of U.S.-based individuals only.  Thus, Plaintiffs' claims and injuries arise from Defendants' conduct occurring primarily, if not entirely, in the United States.

28.     Moreover, Defendants conduct substantial business in the United States. As discussed below, all OnlyFans transactions are processed by U.S.-based payment processor Fenix Internet. Furthermore, approximately 66% of OnlyFans' revenue originated from U.S. markets in 2023.

29.     In addition, the TOS is an adhesive contract between Plaintiffs and OnlyFans. Plaintiffs had no opportunity to negotiate with OnlyFans regarding its terms; and any such negotiation would have entailed vastly unequal bargaining power, since OnlyFans is a wealthy corporate entity with no incentive to amend its terms at Plaintiffs' request.

30.     Finally, England would not provide an adequate substantive remedy or class action vehicle to vindicate Plaintiffs' claims on behalf of the putative class.

## IV.     PARTIES

**Plaintiffs**

31.     Plaintiff M. Brunner ("Brunner") is a natural person and a citizen of the State of Illinois and a resident of Will County.

---

[25] Prior to OnlyFans' August 2024 updates to its TOS, the forum-selection clause contained mandatory language providing that claims arising from the use of OnlyFans' platform "**must be brought** in the courts of England and Wales…" **Exhibit B** at § 16(a) (emphasis added). Among other changes, OnlyFans updated its forum selection clause to, in relevant part: "For all others, the courts of England and Wales **will have jurisdiction** over any claim which arises out of or in connection with your agreement with us or your use of OnlyFans (including non-contractual disputes or claims)." (emphasis added)

32.     Plaintiff J. Fry ("Fry") is a natural person and a citizen of the State of Illinois and a resident of Kane County.

**OnlyFans Defendants**

33.     Defendant Fenix International Limited is a Limited Company registered in England whose principal address is Ninth Floor, 107 Cheapside, London, United Kingdom, EC2V 6DN.

34.     Defendant Fenix International Limited owns and operates the OnlyFans website.

35.     Defendant Fenix Internet, LLC ("Fenix Internet") is a Delaware registered limited liability corporation whose principal address is 2598 E. Sunrise Blvd, Suite 2104, Fort Lauderdale, FL 33304.

36.     Defendant Fenix Internet has a registered office located at 501 Silverside Rd. Suite 87, Wilmington, DE 19809.[26]

37.     Defendant Fenix Internet is a wholly owned subsidiary of, and entirely controlled by, Defendant Fenix International Limited.

38.     Defendant Fenix International Limited is the sole member of Defendant Fenix Internet LLC.

39.     On information and belief, Fenix Internet conducts and transacts all monetary transactions on the website OnlyFans.com.

40.     Defendant Fenix Internet, at OnlyFans' direction, collects payments made by Fans from third-party processors and distributes money it collects through other third-party processors to Creators.

---

[26] Previously, certain Fenix Internet, LLC financial filings have reflected a registered office location at 345 North Canal Street, Chicago, IL 60606.

41.     As the primary conductor of monetary transactions for the OnlyFans website, Fenix Internet directs and sends payments to Creators directly to their bank accounts, including many United States-based financial institutions.

42.     For example, on information and belief, Fenix Internet LLC processes all payments by users on OnlyFans.com to Creators and processes all payments from OnlyFans to Creators on OnlyFans.com.

43.     All the transactions made involving Fans and Creators through the OnlyFans website are transacted in U.S. Dollars.

## V.     <u>FACTS</u>

**OnlyFans and Fenix Internet do Billions of Dollars' Worth of Business in the U.S.**

44.     Since its founding in 2016 by 33-year-old British tech entrepreneur and investor Timothy Stokley, OnlyFans has experienced exponential growth—fueled in large part by the societal impacts of the COVID-19 pandemic which began in 2020.

45.     OnlyFans disclosed in its 2023 Annual Report and Consolidated Financial Statements that it has over 300 million users, over 4.1 million creator accounts, and has paid out over $4.3 billion dollars to its Creators.[27]

46.     Approximately 66 percent of revenue generated by OnlyFans originated from United States markets.[28]

---

[27] Fenix International Limited, *Fenix International Limited Annual Report and Financial Statements for the Year Ended 30 Nov. 2023*, 3 (Nov. 30, 2023), https://find-and-update.company-information.service.gov.uk/company/10354575/filing-history (last visited March 25, 2025).
[28] *Id*. at 33.

**OnlyFans Claims to Offer Users Real, Human Connections**

*OnlyFans Invites Users to Create Accounts, Accept its Terms, and Upload a Payment Card to Access the Platform's Features*

47.     To use OnlyFans as a Creator or Fan (together, "Users"), an individual must register and create an account on www.onlyfans.com.

48.     Before Fans can make any payments or subscribe to Creators' accounts on OnlyFans, they must provide Defendants with their billing information, including the details of their credit card, debit card, or third-party payment account.

49.     As part of the account-creation process, Users must agree to OnlyFans' TOS.[29]

50.     The TOS, to which all Users must indicate their assent, includes the Terms of Use, Acceptable Use Policy, Contract between Fan and Creator, Complaints Policy, Appeals Policy, and Community Guidelines, among other policies.[30]

51.     The sections of the Terms of Use applicable to Fans state that Fans accept and agree to abide by the full TOS, acknowledge the potential for exposure to adult material, and agree to accept OnlyFans' subscription and purchasing policies.

52.     The sections of the Terms of Use applicable to Creators state that Creators accept and agree to terms set by OnlyFans including—how the Creator will receive payouts, determination of how to set a subscription price, restrictions on content, legal responsibility of the Creator, advertising rules, payout rules, and obligations to provide paid-for content.

53.     Before participating in any transaction or subscribing to a Creator, OnlyFans requires Fans to add a payment card to their account. Further, Creators must link their OnlyFans

---

[29] *See generally* OnlyFans, *Terms of Service Content – general terms*, § 8(c)(iv)(1-3), OnlyFans Terms of Service (August 2024), https://onlyfans.com/terms.
[30] *Id.*

accounts to a bank account or select another payment disbursement option to receive earnings payments.[31]

54.     Fans can then subscribe to (or follow) Creator accounts of their choosing.

55.     OnlyFans allows Creators to set the monthly subscription fee for their accounts at between $0 to $50 per month.[32] After subscribing to a Creator's account, OnlyFans allows Fans to access the content on that account.

56.     OnlyFans also tells Fans that they can interact with the Creator directly through direct messages and pay-per-view messages. OnlyFans tells Fans that by adding a monetary tip to a direct message, their message will appear at the top of the Creator's inbox, and Creators often invite Fans to send a tip with a message in order to get a faster reply from the Creator.[33]

57.     In addition, OnlyFans allows Creators to maintain both standard pages and "VIP" pages in order to drive Fan visits and encourage PPV purchases and tips. Standard pages usually entail free subscriptions and limited Creator content, but they often actively lead Fans to VIP pages that require paid monthly subscriptions, offer access to preexisting content, and generally promise faster replies to DMs and other Fan communications—usually for a tip.

58.     Like the other fees paid by Fans, tip transactions are processed by Fenix Internet, and OnlyFans collects 20% of the tips.

---

[31] OnlyFans, *Help: How do I start earning on OnlyFans?*, OnlyFans Community Guidelines, https://onlyfans.com/help/196/244/245 (last accessed March 25, 2025).
[32] OnlyFans, *What can my subscription price be on OnlyFans*, OnlyFans Community Guidelines, https://onlyfans.com/help/196/217/218 (last visited March 25, 2025).
[33] See Wen Hsiao, Rachel Steele, and Louis Weber, *Touched Through a Screen: Digital Intimacy on Twitter and OnlyFans*, University of New Amsterdam Masters of Media Blog (Oct. 19, 2021), https://mastersofmedia.hum.uva.nl/2021/10/touched-through-a-screen-digital-intimacy-on-twitter-and-onlyfans/ (last visited March 25, 2025) (containing screenshots of the pop-up that OnlyFans shows when a Fan is sending a Direct Message "[messages] with tips appear at the top of recipient inbox").

***OnlyFans Sells Fans on Communicating Directly with Creators***

59.    To attract Fans to join OnlyFans and engage in these transactions, OnlyFans promotes itself as a social platform that allows Creators and Fans to develop personal, "authentic connections."[34] This promotion scheme pervades OnlyFans' general advertising, the account creation process, and its platform, which is exclusively accessible to OnlyFans users.

60.    OnlyFans has stated that its mission is: "OnlyFans is the 18+ subscription platform empowering creators to own their full potential, monetize their content, and develop *authentic connections with their fans*."[35]

61.    OnlyFans represents to Fans that it monitors and controls use of its website, including the identities of its users.

62.    Current CEO and former Chief Strategy and Operations Officer, Keily Blair has reinforced the importance of OnlyFans as a safe and trusted community where intimate communications are shared via authentic two-way communication between Fans and Creators.[36] In a May 2024 interview with the Wall Street Journal Blair said, "[Trust and safety] is fundamental to how we operate at OnlyFans."[37] Blair further confirmed that Fan-Creator contact is at the heart of the business model—a community where Fans are assured that OnlyFans is delivering on its promises—safe, direct, intimate, authentic communications between a Fan and a Creator.[38]

---

[34] OnlyFans, *Who We Are*, Only Fans About Page, https://onlyfans.com/about (last visited March 25, 2025). (OnlyFans describing itself as a platform through which "creators . . . monetize their content while developing authentic relationships with their fanbase").

[35] *Id.* (emphasis added).

[36] WSJ News, *OnlyFans CEO Keily Blair on Why the Company Doesn't Track Inbound Traffic*, WSJ News YouTube Page (May 25, 2024), https://www.youtube.com/watch?v=TZAzMDcsTfE.

[37] *Id*.

[38] *Id*.

63.     OnlyFans' former CEO Ami Gan promoted tight controls as a key to OnlyFans business model, stating "Safety is ultimately the foundation of our entire business . . .. For example, we have no anonymity on the platform; we know who everyone is."[39]

64.     OnlyFans touts its safety and control measures as a benefit to Fans and Creators, including multi-point Creator verification measures. OnlyFans promises that its trained monitors identify and take action to remove any Content which they believe violates OnlyFans' TOS and commits to remove bad actors from the site.

65.     OnlyFans' emphasis on the importance of user verification and "no anonymity" reassures Fans that they know who they are communicating with—a reassurance that is at the heart of the OnlyFans platform.[40]

66.     CEO Keily Blair has stated publicly on social media that OnlyFans' direct messaging capability is critical to its business. Yet, OnlyFans' top Creators hire marketing agencies that tout the use of third-party chatters for Fan messaging.[41] OnlyFans is well aware of these agencies.[42]

---

[39] Bruner, *supra* n. 24.
[40] Keily Blair, *Owning It: Reimagining Social Media*, TEDx Talks YouTube Page (Jun. 21, 2023), https://www.youtube.com/watch?v=45bKq_deC-g; WSJ News, *OnlyFans CEO Keily Blair on Why the Company Doesn't Track Inbound Traffic*, WSJ News YouTube Page (May 25, 2024).
[41] *See*, *e.g.*, SEO Bounty, *OnlyFans Account Management*, SEO Bounty Blog (March 11, 2022), https://seobounty.com/account-management-and-growth/; The Bunny Agency Home Page, https://bunny-agency.com/ (last visited March 25, 2025). GhostChatters, *Why Have Chatters*, https://www.ghostchatters.com/why-have-chatters (last visited March 25, 2025); OF Agency, Service, https://www.ofagency.co/services (last visited March 25, 2025).
[42] Slush, *Navigating Public Opinion: Running an Edgy Business* – Amrapali Gan & Keily Balir (OnlyFans & Axios), Slush YouTube Page (Nov. 22, 2022), https://www.youtube.com/watch?v=fgOsTxLVpzM.

67.     OnlyFans' TOS, to which all users must agree in order to create an account and use OnlyFans, also contains numerous provisions that indicate that interactions on OnlyFans are between Fans and Creators.

68.     The TOS specifies that to open a Creator account, a Creator must provide valid forms of ID, pictures, age information, and other details indicating that Creators are always people, not business entities.[43]

69.     The TOS prohibits fraudulent content, and further prohibits using OnlyFans to disseminate, "feature," or "facilitate . . . [i]naccurate information including misleading descriptions of media or account information."[44]

70.     But the Contract Between Fan and Creator ("Fan-Creator Contract") contained in the TOS obfuscates the role that third parties may play in assisting Creators with their content.[45] The Fan-Creator Contract is nested within the TOS, requires an additional action on behalf of a Fan to view, and is only referenced within the Terms of Use by hyperlink requiring a Fan to visit that page separately to understand its import to the Terms of Use.

71.     The Fan-Creator Contract defines a "Creator" as "a User (defined as any user of OnlyFans, whether a Creator or a Fan or both) who has set up their OnlyFans account to post Content for Fans to view."[46]

72.     The Fan-Creator Contract defines a "Creator Interaction," as "an interaction on OnlyFans that grants access to a Creator's Content, including (i) a subscription; (ii) a payment for

---

[43] OnlyFans, *Terms of Service Registering with OnlyFans*, OnlyFans Terms of Service (Aug. 2024), § 6(b), https://onlyfans.com/terms.
[44] OnlyFans, *Terms of Service Acceptable Use Policy*, § 8, OnlyFans Terms of Service (Aug. 2024), https://onlyfans.com/terms.
[45] OnlyFans, *Terms of Service Contractor Between Fan and Creator*, OnlyFans Terms of Service (Aug. 2024) https://onlyfans.com/contract.
[46] *Id*. at § 4(c).

pay-per-view content; and (iii) any other interaction or payment between a User and a Creator's account or content, including direct messages."[47]

73.    The Fan-Creator Contract defines "Content" as "any material Uploaded to OnlyFans by any User, including any photos, videos, audio, livestream material, data, text, metadata, images, interactive features, emojis, GIFs, memes, and any other material whatsoever."[48]

74.    The Fan-Creator Contract informs Fans that Creators are "solely responsible for creating and publishing Relevant Content."[49]

75.    The Fan-Creator Contract defines "Relevant Content" as "the applicable Content of a Creator to which a Creator Interaction relates."[50]

76.    Based on the definitions in the Fan-Creator Contract, a Fan can reasonably expect that any Content or Relevant Content received during a Creator Interaction is created and published by that particular Creator. However, the Fan-Creator Contract goes on to say that "third parties may *assist* Creators in operating their accounts and in Creator Interactions" (emphasis added).[51] By informing Fans that a third-party may be *assisting* a Creator with their account and Creator Interactions—but at the same time requiring that all Content and Relevant Content be created and published by the *Creator*—OnlyFans obfuscates the true role of any third party and does not disclose (or even suggest) that *assisting* Creators with Creator Interactions means performing them on a Creator's behalf. The Fan acknowledgement therefore does not put Fans on notice or inform them of the true nature of third-party involvement in the interaction between the Fan and Creator.

---

[47] *Id*. at § 4(e).
[48] *Id*. at § 4(b).
[49] *Id.* at § 12(b).
[50] *Id.* at § 4(o).
[51] *Id.* at § 12(e).

77.     Nowhere in the TOS (or anywhere else) does OnlyFans disclose to Fans that Creators may not be the ones actually creating and publishing direct messages or other content to Fans. Nor does it require Creators to disclose if they are using a third-party to interact with Fans.

78.     The TOS requires that Creators warrant that content provided is "of satisfactory quality, taking account of any description of the Content, the price, and all other relevant circumstances including any statement or representation which you make about the nature of the Content on your account or in any advertising" and is "as described by [the creator.]"[52]

79.     Further, the TOS contains provisions that allow OnlyFans to withhold and even forfeit Creator earnings if OnlyFans suspects and/or finds violations of the Terms of Service.[53]

80.     Specifically, the TOS contains a section titled "Circumstances in which we may suspend or delete your account and/or content, pause Fan Payments, and/or withhold Creator Earnings", which allows OnlyFans to withhold and even forfeit creator earnings, and return those earnings to the Fans, for violations such as:

> i. if we think that you have or may have seriously or repeatedly breached any part of the Terms of Service….
>
> iii. we suspect that all or any part of the Creator Earnings result from unlawful or fraudulent activity, either by you or by the Fan who made the Fan Payment resulting in the Creator Earnings.[54]

81.     The TOS even states that "[i]f, based on our review of the relevant facts, we determine that any of the above is true, we may . . . refund or cancel Fan payments."[55]

---

[52] OnlyFans, *Terms of Service Terms of Use Content – general terms*, § 8(c)., OnlyFans Terms of Service (Aug. 2024), https://onlyfans.com/terms#terms-use.
[53] *Id.* § 14.
[54] *Id.* § 14(b).
[55] *Id.* § 14(c).

82.     Overall, the TOS conveys to Fans a sense of security that OnlyFans will ensure that the Fan is getting what is advertised and what they are paying for.

83.     OnlyFans' representation that it allows Fans and Creators to develop personal relationships through personal interactions permeates OnlyFans' marketing, account creation, and every Fan's OnlyFans experience.

84.     As a result, this representation of authenticity defines OnlyFans' brand. It is OnlyFans' primary allure—direct, authentic communication with a Creator. In pursuit of it, Fans often fork over large sums of money, which directly and considerably benefit OnlyFans' bottom line.

### OnlyFans Ostensibly Provides Vehicles for Experiencing Genuine Connections

85.     In furtherance of its representations that Fans and Creators can form genuine and "direct" connections on its platform, OnlyFans provides features that facilitate the deception of Fans and induce them to believe that they can develop such connections with specific Creators by exchanging DMs, paying for PPV content, sending tips, and requesting bespoke PPV content.

86.     Using these features, a Fan may request, and pay for, content and communications that are represented as having been created by a particular Creator *specifically for that individual Fan*.

87.     These features are popular—and profitable. They bring in more revenue for OnlyFans than traditional subscriptions. In a recent Wall Street Journal interview, CEO Keily Blair said "[t]he other really interesting thing that we've noticed in terms of trends in the creator economy and in the business in general is that actual revenue from subscriptions now makes up a

*smaller portion of our revenue than from microtransactions. So microtransactions are paid to unlock content, individual messaging, custom messages…*" (emphasis added).[56]

88.    OnlyFans also provides a tipping feature through which Fans can tip Creators for the content they post, with a maximum per tip/transaction amount of $100 for new Fans, and a maximum per tip amount of $200 for Fans who have been on the platform for at least four months.

89.    OnlyFans encourages tips as a mechanism for personalized communication by informing Fans, before they reply to a Creator message through the use of a pop-up in a Fan's message, that "[m]essages with tips appear at the top of [the Creator's] inbox."[57]

90.    OnlyFans also offers Creators a feature on their account pages that purports to indicate their availability. When a Creator has enabled this feature, the Fans visiting the Creator's profile see text indicating if the Creator is available or the last time the Creator was available. Like popular messaging platforms individuals use with their personal contacts, such as Facebook Messenger, when a particular Creator is purportedly available, a green dot appears in the Creator's profile. This is intended to signal to the Fan that the Creator is available for direct communication.

91.    OnlyFans also allows Creators to enable a feature that indicates to Fans when their messages have been read by the Creator. When this feature is enabled, a Fan will see two checkmarks below their sent message once it has been read by the Creator.

92.    Thus, OnlyFans has designed its platform to foster Fans' belief that Creators can and do exchange messages with and create customized content for individual Fans, beyond what is already made generally available on a Creator's account to all subscribers. Based on this design,

---

[56] *See* WSJ News, *OnlyFans CEO Keily Blair on Why the Company Doesn't Track Inbound Traffic*, WSJ News YouTube Page (May 25, 2024), https://www.youtube.com/watch?v=TZAzMDcsTfE.
[57] *See* Hsiao, Steele, and Weber, *supra* n. 33.

and OnlyFans' representations as described herein, it is reasonable for individual Fans to assume they are interacting directly with Creators.

93. OnlyFans also allows Creators to offer free subscriptions, meaning a fan does not pay a monthly subscription fee. But such accounts still allow for paid content such as PPVs and tipping—including sending DMs with tips—leading Fans to believe that, even with a free subscription, by paying for specific content or features, including sending tipped messages, they will be able to interact directly with the Creator.

94. Unbeknownst to Fans, they are not getting what they pay for.

### OnlyFans Wants Creators to Maximize Sales by Any Means—Including Deception

95. Through its DM, PPV, and tipping features, along with monthly subscription fees that draw Fans through access to those features, OnlyFans amasses significant revenue for itself, all through the false promise that Fans are having authentic interactions with Creators in exchange for these payments.

96. Pursuant to its TOS, OnlyFans retains 20% of all revenue generated on its site.[58] Approximately 40% of the revenue stems from monthly subscription fees, and approximately 60% stems from PPV purchases and tips.[59]

97. High-earning Creators likely generate most of OnlyFans' revenue; just the top 1% of Creators generate 33% of all earnings on the platform.[60] OnlyFans' top Creator earns an

---

[58] Only Fans, *Terms of Service Terms of Use Creator Payouts*, §10(b), OnlyFans Terms of Service (Aug. 2024), https://onlyfans.com/terms.
[59] James Clark, *How Much OnlyFans Creators Really Make*, Yahoo!Finance (Dec. 22, 2022), https://au.finance.yahoo.com/news/how-much-only-fans-creators-really-make-001225631.html.
[60] *Id.*

estimated $20 million per month (as of 2021),[61] and many others make six figures per month.

98.     Given OnlyFans' payment structure, the success of its Creators (particularly its highest-earning Creators) translates directly to substantial profit for OnlyFans.

99.     To maximize profits, OnlyFans provides "How-to" articles to Creators on how to promote their accounts and as result generate more revenue. For example, in one such "How-to" article, "How to Promote Your OnlyFans Profile", OnlyFans tells Creators that "cross-promoting your OnlyFans profile on your social media accounts is the perfect first step. For example, you can start by including your OnlyFans or landing page URL in your bio . . . . In addition to your personal social media accounts, consider promoting your OnlyFans profile on forums like Reddit or relevant blogs."[62]

100.    OnlyFans also provides blog posts with such titles as "OnlyFans Campaigns: How to Market Like a Pro" and "How To Get Started With Video Editing." These blog posts are directed at Creators to try and help them operate their accounts, which in turn helps to drive earnings for OnlyFans.

101.    Perhaps the most egregious activity implicitly encouraged and purposefully facilitated by OnlyFans is the use of professional "chatters" to impersonate Creators in order to manipulate Fans into paying as much as possible for PPV content and tips—turning a single Creator account into as many "personal" relationships as possible—24 hours a day, 7 days a week. This Complaint refers to this as the "Chatter Scams."

---

[61] Todd Spangler, *OnlyFans Creators Earned $3.9 Billion in 2021, Swelling 115% Year Over Year*, Variety (Sept. 1, 2022), https://variety.com/2022/digital/news/onlyfans-financials-earnings-creators-1235357264/.
[62] OnlyFans Editor, *How to Promote Your OnlyFans Profile*, OnlyFans Blog (July 29, 2024), https://blog.onlyfans.com/how-to-promote-your-onlyfans-profile/.

### *How Chatter Scams Work and How they Effectively Deceive Fans*

102.     The Chatter Scams are primarily perpetrated by "management agencies" on behalf of Creators. As described in more detail below, these agencies sell their services to OnlyFans Creators with promises that the agencies can increase a Creator's revenue exponentially—without the Creator actually having to do what OnlyFans promises: "directly connect" with Fans. Agencies work to get as many Fans as possible to subscribe to their Creators' accounts, while ensuring the Creators have no real role in the communications with their Fans.

103.     Unlike simply posting content and charging for it, the Chatter Scams involve exceptional levels of coordination and data management to convince individual Fans that they are actually having a direct interaction with a given Creator.

104.     On information and belief, once a Creator engages an agency to operate his or her account, the agency takes over the Creator's account and operates all aspects of the account.

105.     Working in partnership with their Creators, agencies contract with chatters to conduct most, if not all, of the communications between the Creators and the Fans. Without the Fans knowledge, the chatters impersonate the Creators when direct messaging with Fans.

106.     Agencies often use chatters from countries like the Philippines or Venezuela, where they can find relatively well-educated, English-speaking (or even multilingual) workers—but pay them a fraction of what the required skillset would command in the U.S. labor market. Agencies hire chatters of all genders and ages, regardless of the gender or age of the Creator they are hired to impersonate.

107.     Chatter positions—sometimes referred to using deliberately oblique terms like "account manager" or "virtual assistant"—are openly advertised online, and entire online discussion forums have developed around the jobs. Some forums discuss how to get a chatter job,

how chatters can avoid scammers posing as "legitimate" agencies, what to expect in terms of pay, and even the difficulty of the working conditions.

108.   For example, several chatters have posted on the *r/onlyfanschatter* subreddit, where posts have included chatters discussing the labor abuses they suffer at the hands of agencies, such as being forced to work 70-hour weeks or being fired for missing shifts for circumstances outside their control (*e.g.*, power outages). One chatter lamented the fact that chatters are treated like "robots," and felt the need to assert: "We're humans, we feel."

109.   Agencies sometimes provide chatters with actual "scripts" similar to those used by telemarketers and call center employees, which give chatters a specific workflow to follow in order to maximize the amount of money extracted from any given Fan.

110.   The interactions that often garner the most money are when Fans pay for "custom" PPV content created (ostensibly) specifically for an individual Fan. It is very common for Fans to request custom videos from Creators—often spending hundreds of dollars for a single video.

111.   Agencies have sophisticated processes in place to facilitate the generation of custom content. The workflow for a given agency might vary slightly, but often looks something like the following:

   a.   The agency requires a Creator to create a certain amount of "stock" content, in the form of prerecorded videos and contemporaneous still photos, on a regular (usually weekly) basis. That content is uploaded to the cloud using a service like Dropbox or Google Drive, which can then be accessed by agency employees or contractors and used to populate a Creator's OnlyFans "Vault"—a specific online location provided by OnlyFans and designed to keep "exclusive" content accessible only to paying customers.

      b.     The agency provides chatters with direct access to the Creator's OnlyFans account—whether directly (by providing chatters with login information) or indirectly (via third-party CRM software such as SuperCreator (described below) so that the chatter can interact with a Creator's Fans in the place of the Creator.[63]

112.    In addition to requesting custom content, it is common for Fans to send their own photos or videos ("Fan-Generated Content") to a Creator and ask for the Creator's reaction to the content—in which case the Chatter-Creator Communication may also contain Fan-Generated Content. Fan-Generated Content often contains extremely private or sensitive material.

113.    These Chatter Scams have increasingly appeared as "exposes" in mainstream publications, including:

      a.     The New York Times ("The E-Pimps of OnlyFans: Clever marketers have figured out how easy it is to simulate online intimacy at scale, ventriloquizing alluring models with cheap, offshore labor.") (May 2022).[64]

      b.     Wired Magazine ("I Went Undercover as a Secret OnlyFans Chatter. It Wasn't Pretty.") (May 2024).[65]

---

[63] Agencies almost universally require Creators, as a condition of "representation" by the agency, to provide direct access to and control over their OnlyFans accounts. Thus, the Creator never has to log into or operate the account for the operation to run smoothly.

[64] Ezra Marcus, *The "E-Pimps" of OnlyFans*, New York Times (May 16, 2022), https://www.nytimes.com/2022/05/16/magazine/e-pimps-onlyfans.html.

[65] Brendan I. Koerner, *I Went Undercover as a Secret OnlyFans Chatter. It Wasn't Pretty*, Wired Magazine (May 15, 2024) https://www.wired.com/story/i-went-undercover-secret-onlyfans-chatter-wasnt-pretty/?source=Email_0_EDT_WIR_NEWSLETTER_0_BACKCHANNEL_ZZ&utm_source=nl&utm_brand=wired&utm_mailing=WIR_Backchannel_051724&utm_campaign=aud-dev&utm_medium=email&utm_content=WIR_Backchannel_051724&bxid=&cndid=&hasha=23463b99b62a72f26ed677cc556c44e8&hashb=914fec35ce8bfa1a067581032f26b053591ee38a&esrc=&utm_term=WIR_Backchannel.

c. El París ("$500 a day to pretend to be a model: The big business behind OnlyFans 'chatters'") (November 2023).[66]

d. Cosmopolitan Magazine ("Watch out for the OnlyFans pimps: can they really make you millions?") (June 2024).[67]

e. The Independent ("They thought they were chatting with OnlyFans models. The truth was much darker") (March 2025).[68]

114. For the most part, the agencies engaged in Chatter Scams do not appear to have any qualms about defrauding Fans—often using terms like "farming" to refer to the process of fleecing or squeezing Fans for as much money as possible.

115. Additionally, multiple companies in recent years have developed specialized tools designed to facilitate the use of a single OnlyFans account by multiple people—explicityly including teams of Chatters. These tools are essentially customer relationship management ("CRM") software designed to allow agency teams to access an individual Creator's OnlyFans account simultaneously.

116. For example, an application called "SuperCreator" explicitly advertises to agencies and Creators their ability to facilitate the use of OnlyFans accounts by Chatters.[69]

---

[66] Marco Antonio Homes, *$500 a day to pretend to be a model: The big business behind OnlyFans 'chatters'*, El Pais, https://english.elpais.com/international/2023-11-23/500-a-day-to-pretend-to-be-a-model-the-big-business-behind-onlyfans-chatters.html.

[67] Sian Bradley, *Watch out for the OnlyFans pimps: can they really make you millions*, Cosmopolitan, https://www.cosmopolitan.com/uk/reports/a60637412/onlyfans-agencies/.

[68] Holly Baxter, *They thought they were chatting with OnlyFans models. The truth was much darker*, The Independent (March 5, 2025), https://www.independent.co.uk/news/world/americas/onlyfans-models-chatters-reddit-class-action-lawsuit-b2710675.html.

[69] Supercreator, *What is Supercreator*, https://www.supercreator.app/what-is-supercreator (last visited March 25, 2025).

117.    On information and belief, OnlyFans is aware of the use of the CRM software on its platform—as well as the fact that the use of such software violates OnlyFans' Terms of Service—but chooses to do nothing to prevent the use of such software in order to continue profiting from the increased revenues facilitated by the CRM software.

**OnlyFans knows or should know that Chatter Scams are rampant on the platform.**

118.    Despite OnlyFans' clear message to Fans that OnlyFans' primary offering is "authentic relationships," through "direct communications," many high-earning Creators do not operate their own OnlyFans accounts and do not actually communicate with Fans.

119.    The prevalence of Chatter Scams has long been an open secret to industry insiders, and while OnlyFans publicly disavows any association with the management agencies, myriad evidence supports an inference that OnlyFans is aware of the Chatter Scams.

120.    Evidence of OnlyFans' actual knowledge of the Chatter Scams is bolstered by evidence that if nothing else, OnlyFans *should know* about the scams from monitoring its platform—something it not only admits doing, but actively touts as part of its emphasis on "safety." In 2022, for example, OnlyFans' then-CEO Ami Gan told Time Magazine that "[s]afety is ultimately the foundation of our entire business," boasting that the company's verification protocols were so robust that "we have no anonymity on the platform; we know who everyone is." She went on to describe what she called the platform's "very robust content moderation," confirming that not only can OnlyFans monitor the activity happening on Creator accounts, but the company prides itself on doing so: "Everything on OnlyFans, we see it, we're able to view it, moderate it, and make

sure that everyone is following our terms of service. While we do use some automated technologies to help us prioritize content, ultimately everything on the site is reviewed by a human."[70]

121.    These statements are also consistent with OnlyFans' Privacy Policy (attached hereto as **Exhibit C**), which claims to be collecting customer data ***for the specific purpose of detecting deceptive activity***—explaining that one of the reasons the company collects and processes customer data is for the purpose of "[m]onitoring transactions and company network, systems, applications, and data" in order to, among other things, "detect malicious, deceptive, fraudulent, or illegal activity."[71]

122.    This not only (falsely) suggests to Fans that OnlyFans is actively trying to prevent fraud and deceptive conduct, but demonstrates that OnlyFans has the *ability* to do so given the type of data it collects.

123.    For example, data gathered about the use of the "company network" or "systems" includes information about how many different devices are logged into an account at a given time, as well as where those devices are located. The fact that OnlyFans routinely gathers this information is evidenced in the "security" emails it sends to users when an account is accessed from a new device or a new location, *see* **Figure 1**, *below*—and the fact that it even provides account holders (both Fans and Creators) with information on specific "login session" occurring on their accounts. *see* **Figure 2**, *below*.

---

[70] Raisa Bruner, *OnlyFans CEO Ami Gan Wants to Dispel Misconceptions About the Company*, TIME (July 31, 2022), https://time.com/6202306/onlyfans-ceo-ami-gan-interview/ (emphasis added).
[71] OnlyFans, *Privacy Policy*, ¶ 10, OnlyFans Privacy Policy (Aug. 2024), https://onlyfans.com/privacy.



**Figure 1.** *Email sent from OnlyFans to a user after a new login attempt from an unusual location.*



**Figure 2.** *Screenshot of OnlyFans User Account showing multiple active login sessions, including IP address from which each session originates.*

124. Although this information is ostensibly provided in order to put account holders on notice of potentially unauthorized or malicious activity, the fact that OnlyFans sends such notices demonstrates that the platform routinely collects information sufficient to put the company itself on

notice that Creator accounts are using chatters, including: (1) the number of devices logged into an account simultaneously, (2) the location of every device that logs into an account, and (3) the frequency and duration of logins, including those from different locations.

125.    On information and belief, based on the foregoing, OnlyFans would also know that chatters are logging in for a Creator.

126.    Any suggestion that OnlyFans is ignorant of the fact that Creators hire agencies to manage their accounts is undermined by the fact that OnlyFans has specifically marketed directly to agencies themselves.

127.    The archives of the OnlyFans Blog show a post in February 2019 entitled "Unlocking the earning potential for agencies and talent managers," which explained that "as brands and manufacturers look to access influencers that synergise with their audience demographic, **agencies have become a key ally to help develop subliminal content marketing campaigns and connect brands with the right type of influencer.**"[72]

128.    In a section entitled "HOW YOUR AGENCY BENEFITS," OnlyFans provided a graphic representation of an "example agency model" in which the agency's annual income from the platform totaled nearly half a million dollars, suggesting that engaging with the platform "and making OnlyFans a part of your agency proposition" could make a "significant impact on agency incomes" and that "**OnlyFans provides a lucrative opportunity for creators and agencies,**" so "[w]hy not give us a call or email us to discuss the potential of OnlyFans to your agency business and influencer communities?"[73]

---

[72] Alex, *Unlocking the Earning Potential for Agencies and Talent Managers*, OnlyFans Blog (Feb. 20, 2019), https://web.archive.org/web/20220811014012/https://blog.OnlyFans.com/unlocking-the-earning-potential-for-agencies-and-talent-managers/ (last visited March 25, 2025) (emphasis added).
[73] *Id*.

129. Not only did the post generally refer to income-generating opportunities, though. It also specifically referred to the "***additional income opportunities***" an agency might gain from "***assist[ing] creators on their subscriber content*** and campaigns for brands"—and strongly suggested that such assistance by agencies would in fact be critical to the ability of Creators to monetize content:

> Ensuring subscriber numbers grow and are retained ***comes down to ensuring the content experience is enhanced for paying fans,*** who are really at the heart of this. It's not simply a matter of expecting fans to pay for what they already get on Instagram, or other social platforms, for free. ***Getting this right depends of*** [sic] ***the expertise of agents to manage their creator communities*** and, in doing so, it provides a long term income stream for creators and agency businesses.[74]

130. The post was still on OnlyFans website as of August 2022.[75]

***OnlyFans Facilities Fraudulent Sales or Practices in part by Failing to Control Them***

131. On information and belief, OnlyFans does not maintain any security measures or safeguards to prevent the deceptive conduct described above.

132. Despite the fact that the OnlyFans TOS includes provisions allowing OnlyFans to monitor and potentially withhold or forfeit Creator earnings for violations of the Terms of Service, OnlyFans fails to do so for Creator accounts using third parties to masquerade as the Creator in interactions with Fans.

133. Despite verifying users' identities during the account creation process, OnlyFans does not require any authentication when an individual logs into the Creator account, and allows multiple individuals to be logged in to a single Creator's account at once.

134. Fans have complained to OnlyFans upon discovering they have been the victim of a Chatter Scam only to be ignored—or even retaliated against.

---

[74] *Id*. (emphasis added).
[75] *Id*.

135.    For example, one Fan wrote a post entitled "OnlyFans – Was not chatting to the Creator I subscribed to," in which the Fan detailed the process by which he learned he had been chatting not to a Creator but to a paid chatter.[76] The user detailed that he subscribed to a Creator that he was already familiar with through her work outside OnlyFans and that the responses he was receiving to his messages led him to believe that he was not communicating directly with the Creator.[77] When he reached out to OnlyFans tech support "They said that they [OnlyFans] do allow creators to hire a 3rd party to manage their accounts (but they didn't say anything about a 3rd party masquerading as the creator)."[78]

136.    Another Fan had similar complaints: "I have found multiple circumstances where the actual content creator (model) is NOT the actual person communicating with you… [t]hese 'hired' people then 'impersonate' the model and use the first person, 'Yes it's me', and 'I', falsely and fraudulently, to give the subscriber the impression that they are communicating with the model, but in these cases THEY ARE NOT!"[79] When the Fan contacted OnlyFans it "ADMITTED that 'content creators can use agents, management companies, and other 3rd parties to OPERATE their account for them." And, a couple of days later "OnlyFans spotted my review and rather than want to resolve a customer problem, they arrogantly sent me a message that instead, they TERMINATED my account!"[80]

---

[76] User Post, *Was not chatting to the creator I was subscribed to*, Pissed Consumer (May 12, 2023), https://onlyfans.pissedconsumer.com/46/RT-P.html?sort=latest#reviews (last visited March 25, 2025).

[77] *Id*.

[78] *Id*.

[79] User Post, *Hired staff impersonate models in chat. - FRAUD*, PISSED CONSUMER (Aug. 5, 2023), https://onlyfans.pissedconsumer.com/37/RT-P.html?sort=latest#reviews (last visited March 25, 2025).

[80] *Id*.

137. And OnlyFans includes only obfuscatory and conflicting disclaimer language in the TOS—never indicating to Fans that they might not be communicating directly with the Creator they are messaging, or that the Creator could use third parties to send messages, which is consistent with the experience of the aforementioned Fans.

### OnlyFans Harms Fans Through its Deceptive Conduct

138. Based on OnlyFans' representations and omissions described herein, when a Fan pays money to engage with a Creator, there is an expectation that the money is being spent to interact with that specific Creator.

139. Thus, OnlyFans induces Fans to spend money that they would not have spent, or spend more money than they would otherwise have spent, in order to use the features and access the content on its website.

140. When the interaction is in fact with an unknown third party as part of a Chatter Scam, the Fan is harmed. Not only does the Fan not receive what was paid for (an authentic interaction with a specific Creator), but the Fan is being deceived and in some circumstances manipulated to pay for additional interactions as well as having their data shared with third parties without their consent.

141. The harm that Fans suffer is not only monetary but can also be emotional and mental harm upon discovery that the Fan has engaged in intimate exchanges with an impostor, or even multiple impostors.

### Plaintiff Brunner's Experience with OnlyFans

142. Plaintiff Brunner created an OnlyFans account in approximately June 2021.

143. Plaintiff Brunner chose to create an account in order to interact with Creators, including MissKenzieAnne.

144.    Plaintiff Brunner paid for a monthly subscription ($10.99 per month) to MissKenzieAnne's OnlyFans account in October, November, and December 2023. In December 2023, MissKenzieAnne offered Plaintiff Brunner a free year-long subscription.

145.    From January 2024 through October 2024 Plaintiff Brunner exchanged direct messages, sometimes paid for, with MissKenzieAnne's account on a daily basis.

146.    In addition to the direct messages, Plaintiff Brunner paid for MissKenzieAnne's PPV content and paid to unlock audio messages and pictures on MissKenzieAnne's account on a daily basis—paying to unlock approximately 3-5 audio messages or pictures a day.

147.    Upon information and belief, a third-party agency ran MissKenzieAnne's OnlyFans Creator account during the period in which Plaintiff Brunner was attempting to communicate with her on the platform.

148.    Based on Plaintiff Brunner's experience interacting with MissKenzieAnne's account, MissKenzieAnne did not send or receive messages on OnlyFans herself. Instead, personnel from an agency, posed as MissKenzieAnne and read the messages that Brunner sent to MissKenzieAnne, and sent the messages that Brunner received from MissKenzieAnne's OnlyFans account.

149.    Upon information and belief, a single individual could not send the number of DMs or PPVs required to generate the revenue that MissKenzieAnne's account generates, as more than 700,000 Fans have liked or followed her OnlyFans account.

150.    Upon information and belief, the messages sent to and received from the MissKenzieAnne account are sent by one or more third parties who impersonate her.

151.    Plaintiff Brunner did not pay to renew or continue his monthly subscription to MissKenzieAnne's account after December 2023, but continued to pay MissKenzieAnne for a variety of content thereafter until October 2024.

152.    Upon information and belief, all the payments that Plaintiff Brunner made on the OnlyFans website were processed by Fenix Internet.

153.    When Plaintiff Brunner created his OnlyFans account, when he paid for subscriptions, when he sent and received messages to specific Creators (including MissKenzieAnne), and when he paid to unlock content sent to him by those Creators, Plaintiff Brunner believed that he was interacting directly with the Creators.

154.    If Plaintiff Brunner had known that the messages sent to and from MissKenzieAnne's Creator account were neither read nor sent by MissKenzieAnne herself, he would not have subscribed to her Creator account or would have paid less to subscribe to her Creator account.

155.    If Defendants were to curtail the unlawful practices alleged herein, Plaintiff Brunner would consider resuming spending money on the OnlyFans platform to subscribe to Creator accounts, message with Creators, and/or access Creator PPV content.

**Plaintiff Fry's Experience with OnlyFans**

156.    Plaintiff Fry created an OnlyFans account in approximately January 2023.

157.    Plaintiff Fry created an account primarily in order to engage in friendly conversations with models and share photographs of his cooking creations.

158.    Following his initial account creation, Plaintiff Fry began to subscribe to the accounts of various Creators, including Jia Lissa and Spicy Pie.

159.    Plaintiff Fry paid to subscribe to Jia Lissa's Creator account in or around January 2023.

160.    Plaintiff Fry paid to subscribe to Spicy Pie's Creator account in or around February of 2023.

161.    Plaintiff Fry also paid additional fees to access content on these Creator accounts. For example, on a monthly basis from January 2023 through October 2023, Plaintiff Fry paid to send or receive messages from Jia Lissa and Spicy Pie—as well as sending them tips and paying for other PPV content during that time period.

162.    Creators Jia Lissa and Spicy Pie are managed by social media management agency AS Talent Agency, a company focused on creators of adult content on OnlyFans. According to AS Talent Agency's website "AS Talent is the leading OnlyFans marketing and management agency. In over three years we have successfully helped many creators unlock their true potential of their OnlyFans careers and multiply their earnings."[81] AS Talent Agency advertises that they provide extensive support: "[o]ur professional team provides 24/7 support at every stage of our work, from OnlyFans account management to content creation."[82] And "w[e] provide all our clients with personalized 24/7 support, which includes optimizing your social media pages to attract more traffic. We also **help establish proper communication with new fans and convert them into loyal subscribers.**" (emphasis added).[83]

163.    Upon information and belief, Creators Jia Lissa and Spicy Pie engaged AS Talent Agency or another agency on its behalf to run their OnlyFans Creator accounts, including sending

---

[81] *See* AS Talent Agency Home Page, https://astalentagency.com/ (last visited March 25, 2025).
[82] *Id*.
[83] *Id*.

and receiving messages from Fans, during the period in which Plaintiff Fry was paying to access their content on the platform.

164.    Upon information and belief, the messages sent to and received from Jia Lissa and Spicy Pie were sent by chatters paid to impersonate them, most likely individuals working with AS Talent Agency.

165.    Plaintiff Fry spent additional money on the OnlyFans platform, including to subscribe to, message with, and access content on other Creators' accounts. Upon information and belief, some of those Creators engaged third parties to communicate with Fans during the period that Plaintiff Fry was paying to interact with them.

166.    When Plaintiff Fry created his OnlyFans account, when he paid for subscriptions, when he sent and received messages to Creators, when he paid to unlock content sent to him by Creators, and when Plaintiff Fry sent tips to Creators, Plaintiff Fry believed that he was interacting directly with those Creators.

167.    If Plaintiff Fry had known that the messages sent to and from those Creator accounts were neither read nor sent by those Creators themselves, he would not have subscribed (or would have paid less to subscribe) to their accounts or would have paid less to subscribe to their accounts.

168.    Over time, Plaintiff Fry began to become suspicious of who he was actually communicating with when purportedly exchanging DMs with Creators, as messages he received contained contradicting information or errors leading him to suspect that he was not communicating with the Creator he believed he was communicating with.

169.    As a result of these suspicions, he stopped paying for direct messages or PPVs with those Creators.

170. If Defendants were to curtail the unlawful practices alleged herein, Plaintiff Fry would consider spending money on the OnlyFans platform to subscribe to and/or message with Creators, and/or to access Creator PPV content.

171. Upon information and belief, all of the payments that Plaintiff Fry made on the OnlyFans website were processed by Fenix Internet.

## VI.    CLASS ACTION ALLEGATIONS

172. Plaintiffs bring this lawsuit as a class action, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1)-(3), on behalf of themselves and all others similarly situated as members of the proposed Class. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

173. The **Class Period** is defined as the period of time within the applicable statute of limitations preceding the filing of this action and before the date of class certification.

174. The **Fed. R. Civ. P. 23(b)(2) Class** is defined as:

> All U.S. registered OnlyFans account holders who maintained an OnlyFans account at any time during the Class Period while residing in the U.S.

> **Illinois subclass:**

> All Illinois registered OnlyFans account holders who maintained an OnlyFans account at any time during the Class Period while residing in Illinois.

175. The **Fed. R. Civ. P. 23(b)(3) Class** is defined as:

> All U.S. registered OnlyFans account holders who, at any time during the Class Period, maintained an OnlyFans account and paid OnlyFans for one or more of the following, where the Creator engaged a third party to communicate with the account holder: (a) a subscription fee for the Creator-account, (b) a fee or payment to view the Creator's PPV content, (c) a fee or payment to send or receive a direct message (DM) to or from the Creator-account, or (d) a monetary tip to the Creator-account.

**Illinois subclass:**

All Illinois registered OnlyFans account holders who, at any time during the Class Period while a resident of Illinois, maintained an OnlyFans account and paid OnlyFans for one or more of the following, where the Creator engaged a third party to communicate with the account holder: (a) a subscription fee for the Creator-account, (b) a fee or payment to view the Creator's PPV content, (c) a fee or payment to send or receive a direct message (DM) to or from the Creator-account, or (d) a monetary tip to the Creator-account.

176. Subject to additional information obtained through further investigation and discovery, the foregoing Classes may be expanded or narrowed by amendment or amended complaint.

177. Specifically excluded from the Classes are Defendants and any of their respective officers, directors, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Classes are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff, and persons who timely and properly exclude themselves from the Class. Any entity in which one or more Defendants had a controlling interest or which had a controlling interest in one or more Defendants is also excluded from the Classes.

178. **Numerosity:** The members of each Class and subclass are so numerous that joinder is impracticable. Plaintiffs believe there are in excess of one million individuals in the United States fitting in the Class definitions. Plaintiffs further believe that there are thousands of individuals fitting in the Illinois subclass definitions. The exact number is unknown to Plaintiffs at this time and can only be confirmed from information and records in the possession, custody, or control of Defendants.

179. **Commonality and Predominance**: There are numerous questions of law and fact common to the putative Class Members that predominate over any questions affecting only

individual members of the Classes. The common questions in this case are capable of having common answers. Plaintiffs claim that Defendants unlawfully and improperly deceived and defrauded its Fans by allowing third parties to send communications on behalf of Creators in violation of OnlyFans' TOS, such that Plaintiffs and putative Class Members will have identical claims capable of being efficiently adjudicated and administered in this case. Among the common questions of law and fact are:

A.      Whether Defendants misrepresented to Plaintiffs and Class Members that they were interacting directly with Creators on the OnlyFans website;

B.      Whether Defendants omitted or concealed from Plaintiffs and Class Members the fact that third parties send messages to Fans on the OnlyFans website, purporting to be specific Creators;

C.      Whether Creators and/or third-party agencies hire chatters to communicate with Fans as though they were those particular Creators; thereby creating a scheme in which the Fans are deceived into believing that they are communicating with those Creators;

D.      Whether Defendants know or should reasonably know that Creators (in particular high-earning Creators) use third-party agencies to interact with Fans on the OnlyFans website;

E.      Whether Defendants help facilitate the Chatter Scams;

F.      Whether Defendants have business controls/practices/devoted resources in place to monitor their Platform in order to mitigate/eliminate unlawful, deceptive, and untruthful communications—including Chatter Scams;

G.    Whether Defendants have a system in place for detecting unlawful, deceptive and untruthful communications or practices; a process to enforce and provide relief to those Fans harmed; and if so, the history of any such enforcement;

H.    Whether Defendants are liable for statutory, compensatory and/or consequential damages, and/or restitution; and the amount of such damages and/or restitution;

I.    Whether Defendants' top-earning Creators are physically able/capable of personally conducting the volume of purportedly direct communications with their Fans necessary to account for the massive profits they are generating every month;

J.    Whether Defendants should disgorge the unlawful profits they have obtained through the use of their platform for the purpose of deceptively communicating with their Fans;

K.    Whether Defendants had knowledge that Creator accounts were being used deceptively, including by third-party agencies, to unlawfully inflate profits; and

L.    Whether Defendants should have known that Creator accounts were being used deceptively, including by third-party agencies, to unlawfully inflate profits.

180.   **Typicality**: Plaintiffs' claims are typical of the claims of putative Class Members, as they are all based on the same factual and legal theories. The claims of Plaintiffs and putative Class Members are all premised on Defendants' knowing facilitation of conduct that deceived and defrauded Fans.

181.   **Adequacy**: Plaintiffs willfully and adequately assert and protect the interests of the putative Class and have retained competent counsel. Plaintiffs have obtained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other respective

members of the Class and have the financial resources to do so. Plaintiffs have no interests antagonistic to those of the putative Class, and there are no defenses unique to Plaintiffs. Neither Plaintiffs nor their counsel have any interests adverse to those of the other putative Class Members.

182. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all putative Class Members is economically infeasible and procedurally impracticable. While the aggregate damages sustained by the putative Class are in the millions of dollars, individual damages incurred by each putative Class Member resulting from Defendants' wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual putative Class Members prosecuting their own separate claims is remote, and even if every putative Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation of such duplicative cases.

183. **Risks of Prosecuting Separate Actions**: The prosecution of separate actions by putative Class Members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. Additionally, individual actions may be dispositive of the interests of the putative Class as a whole, although certain putative Class Members are not parties to such actions.

184. **Policies Generally Applicable to the Class**: This case is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Plaintiffs and the proposed Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Class. Defendants' practices challenged herein apply to and affect the members of the Class uniformly,

and Plaintiffs' challenge to those practices hinges on Defendants' conduct with respect to the proposed Class as a whole, not on individual facts or law applicable only to Plaintiffs.

## TOLLING OF STATUTE OF LIMITATIONS

185.    The statutes of limitation applicable to Plaintiffs' claims are tolled as a result of Defendants' knowing and active concealment of the alleged conduct. Plaintiffs did not and could not have reasonably verified the true nature of the Chatter Scams because the OnlyFans Defendants falsely represented to Fans that they were talking directly with Creators.

186.    Those Creators that used agencies to communicate with Fans did not disclose that the accounts were being run or managed by agencies or that Plaintiffs and Class Members were communicating with chatters.

187.    Plaintiffs' claims are therefore tolled under the discovery rule.

188.    The causes of action alleged herein did not accrue until Plaintiffs discovered or should have discovered the Chatter Scams.

189.    To this day, Defendants do not disclose the use of chatters on the OnlyFans platform or the fact that users will often not be having authentic and direct communications with Creators, especially high-earning Creators, because most, if not all, of those communications will be with chatters impersonating the specific Creator interacting with the Fan.

190.    Plaintiffs and other Class Members could not have learned about the full extent of the Chatter Scams or Defendants' misconduct through the exercise of reasonable diligence, especially with Defendants working to conceal the Chatter Scams.

191.    For most users, the full extent of Chatter Scams is still unknown, making the discovery rule appropriate.

192.    For these reasons, all applicable statutes of limitations have been tolled by the operation of the discovery rule.

## VII.    CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE FEDERAL VIDEO PRIVACY PROTECTION ACT (VPPA)
### (18 U.S.C. § 2710)
### (Against All Defendants)

193.    The Video Privacy Protection Act ("VPPA" or, in this claim, "the Act") was passed to protect the ability of Americans to obtain and watch video content in private spaces without risk that the businesses providing them those videos would disclose the nature of that content to anyone "without the watcher's consent."[84]

194.    To that end, the Act prohibits a "video tape service provider" from knowingly disclosing a customer's "personally identifiable information" without that customer's consent.

**OnlyFans collects personally identifying information about Fans.**

195.    In its Privacy Policy, OnlyFans admits to collecting the following categories of information: "User Data," including a Fan's "email address" and "telephone number;" "Account Data," which includes: "profile name"; "password"; "avatars and headers of your Fan account"; "your subscriptions"; "comments on posts made from your Fan account"; "chat messages between you and other users"; "customer support queries that you submit to us"; "text and content uploaded to OnlyFans[,] livestreaming on OnlyFans[,] content sent in chat messages on OnlyFans." [85]

---

[84] *Developments in the Law—More Data, More Problems*, 131 Harv. L. Rev. 1715, 1722 (2018).
[85] OnlyFans, *Privacy Policy*, §§ 8 (Categories of Personal Data), 10 (How/why your Personal Data is used and lawful bases for processing), OnlyFans Privacy Policy (Aug. 2024), https://onlyfans.com/privacy. Attached as **Exhibit C**.

196.    Each time a Fan interacts with a Creator's account via OnlyFans, the platform collects and transmits information sufficient to identify the specific Fan, including the Fan's username, which can be used by anyone to locate and view the Fan's profile on OnlyFans. Thus, any interaction related to a Fan's request for or viewing of any video content is considered personally identifying information ("PII") about that Fan,[86] since it would allow an ordinary person to connect an individual Fan with the specific content that they requested and/or viewed—including the titles or filenames of videos, as well as the subject matter of those videos—and thus to identify the video-watching behavior of individual Fans, including Plaintiffs and Class Members.

197.    Indeed, the Chatter Scams only function effectively through the nonconsensual disclosure of Fan PII: by creating a communication history viewable by chatters so that they can convincingly impersonate a specific Creator and maintain the deception that the Creator has an ongoing relationship with the Fan—including intimate knowledge of the Fan's history and preferences, specifically with respect to video content—in order to manipulate Fans into purchasing additional content on those false pretenses.

**Defendants are video tape service providers under the Act.[87]**

198.    Defendants are engaged in the business of selling and/or delivering audiovisual materials. The entire purpose of the OnlyFans platform is to deliver content from Creators to Fans

---

[86] The Act defines PII as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider," 18 U.S.C. § 2710(a)(3).

[87] 18 U.S.C.S. § 2710(a)(4) (defining video tape service provider as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials, or any person or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2)").

(and vice versa, with respect to Fan-Created Content).[88]

199.     On information and belief, a substantial portion of that content is made up of prerecorded videos,[89] which OnlyFans not only stores, but organizes, on behalf of Creator accounts. OnlyFans describes this feature of the platform as "the Vault," which "stores all of your previously-posted [sic] or scheduled photos, **videos**, and **live streams,**"[90] and emphasizes the Vault's ability to "set aside content already shared with subscribers over DM," so that if a Creator "forgot which content you've sent out over messages or PPV, the Vault will remember for you."[91] OnlyFans also provides a "Stories" feature, which it describes as "videos that display for only 24 hours."[92]

200.     Plaintiffs and Class Members purchased content directly from Defendants, and OnlyFans' fee structure effectively gives Defendants what amounts to a "commission" on every video sold via the platform—whether by subscription or PPV.

201.     Defendants knowingly disclosed Plaintiffs' and Class Members' PII without their consent.

202.     Defendants know that the PII being disclosed is intended to be private and confidential, yet OnlyFans never informed Plaintiffs or Class Members of the possibility that their

---

[88] Another feature that OnlyFans touts is automatically turning livestreams into pre-recorded video. OnlyFans, *Ultimate Guide to OnlyFans Features*, OnlyFans Blog (July 12, 2023), https://blog.onlyfans.com/ultimate-guide-to-onlyfans-features/ ("OnlyFans automatically adds your streamed videos to your Vault so fans can watch it later as a video-on-demand.").

[89] OnlyFans' TOU defines "content" as "any material uploaded to OnlyFans by any User (whether a Creator or a Fan), including any photos, videos, audio (for example music and other sounds), livestream material, data, text (such as comments and hashtags), metadata, images, interactive features, emojis, GIFs, memes, and any other material whatsoever." OnlyFans, *Terms of Use*, § 2(c), OnlyFans Terms of Use (Aug. 2024), https://onlyfans.com/terms (emphasis added).

[90] *Supra* n. 89.

[91] *Id.*

[92] *Id.*

PII might be disclosed to anyone other than the Creator whose account they were interacting with ("Selected Creator"). While the Contract Between Fan and Creator discloses that third parties may assist Creators in operating their accounts and in Creator Interactions, it does not disclose that a Fan's PII will be disclosed to these third parties.

203.   Defendants never obtained Plaintiffs' or Class Members' consent for their PII to be disclosed to anyone other than their selected Creators. Nor did Plaintiffs or Class Members give such consent to any other parties—including the Creators themselves.

204.   Plaintiffs and Class Members did not consent to having any of their communications or personal information—including PII—shared with anyone other than their selected Creators.

205.   Plaintiffs and Class Members were unaware of the fact that their PII (including names, usernames, messages, message content, and video viewing histories) were being disclosed to anyone other than their Selected Creators.

206.   Through its platform, which facilitates the communication of information between Fan and Creator accounts, OnlyFans disclosed Plaintiffs' and Class Members' PII to other people, including third-party agencies and chatters, knowing that Plaintiffs and Class Members had not consented to disclosure of their PII to anyone other than their selected Creators.

207.   None of the VPPA's exceptions to the consent requirement apply in this case. Specifically, Defendants' wrongful disclosures were not done in the "ordinary course of business" but were done for the purpose of illegal and fraudulent conduct.

208.   Defendants' conduct is illegal, offensive, and contrary to Plaintiffs' and Class Members' expectations.

209.     As a result of these violations, Plaintiffs and the Class are entitled to statutory damages, punitive damages, attorney's fees, and any other relief deemed appropriate by the Court.

### COUNT II
**Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing**
**(On behalf of the Nationwide Class against Defendants)**

210.     Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

211.     Plaintiffs and OnlyFans have contracted for services, as set forth above and as described in the Terms of Service and other related documentation.

212.     OnlyFans' Fan-Creator Contract states that all Content or Relevant Content is created by and published by the Creator who opened a given Creator account.

213.     OnlyFans' Terms of Service state that, when Fans pay for services, the Creator must perform their part of the transaction, including providing the customized content paid for by the Fan.

214.     OnlyFans' Terms of Service prohibit misleading, deceptive, and fraudulent conduct.

215.     Through its TOS, OnlyFans promised Fans such as Plaintiffs and Class Members that paying to subscribe to a Creator's account would allow them to communicate directly with that Creator. The Terms of Service further promise to Fans such as Plaintiffs and Class Members is that, by sending a paid message to a Creator or by paying to view PPV messages, the Fan would be engaging in communications directly with the Creator.

216.     OnlyFans' Terms of Service create the reasonable expectation by Plaintiffs and Class Members that, by paying to subscribe to a Creator's account and by paying for messages or

purportedly individualized content there, Plaintiffs and Class Members were communicating directly with the Creator.

217.     OnlyFans' Terms of Service authorize OnlyFans to withhold, forfeit, and return Creator earnings to Fans for serious or repeated breaches of the Terms of Service. This term promises to—and/or creates a reasonable expectation by Plaintiffs and Class Members that—OnlyFans will curtail serious or repeated breaches of the Terms of Service that OnlyFans knows or has reason to know are occurring.

218.     Under the laws of the states where OnlyFans does business, parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party. In such circumstances, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations.

219.     This means that OnlyFans is prohibited from exercising its discretion to enrich itself by allowing and facilitating rampant breaches of the Terms of Service to the detriment of Fans. Indeed, OnlyFans has a duty to honor the Terms of Service in a manner that is fair to Plaintiffs and Class Members and in accordance with their reasonable expectations.

220.     OnlyFans does not comply with its promises to Plaintiffs and Class Members that, by paying for services on and through the OnlyFans website, they will be able to communicate directly with Creators.

221.     Further, instead of exercising its discretion in good faith and consistent with customers' reasonable expectations, OnlyFans abuses that discretion by facilitating deceit, taking no action to stop that deceptive conduct, processing deceptive transactions, and taking its 20% cut of all such transactions.

222.    By exercising its discretion to enrich itself while participating in the deception of its customers, OnlyFans consciously and deliberately frustrates the agreed common purposes of the contract and disappoints the reasonable expectations of Plaintiffs and Class Members, thereby depriving them of the benefit of their bargain.

223.    Plaintiffs and Class Members have performed all, or substantially all, of the obligations imposed on them under the Terms of Service as set forth above.

224.    Plaintiffs and Class Members have sustained damages as a result of OnlyFans' breaches of its promises as set forth above.

**COUNT III**
**Unjust Enrichment**
**(In the Alternative to Count II)**
**(On behalf of the Nationwide Class against Defendants)**

225.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

226.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

227.    This claim asserts that it is inequitable, unfair, and unjust to allow Defendants to retain profits from their deceptive, misleading, and unlawful conduct alleged herein.

228.    Defendants misrepresented to Plaintiffs and the Nationwide Class that, by purchasing paid subscriptions to a Creator's page, paying to send or receive messages to Creators (including by sending tips), or paying for a Creator's PPV content, Plaintiffs and Class Members would be interacting directly with the Creators.

229.    Plaintiffs and the Nationwide Class conferred benefits upon Defendants in the form of payments they made in order to interact directly with Creators.

230.    As detailed above, Defendants are aware that, unbeknownst to Fans, many Creators (including the highest-earning Creators) on OnlyFans engage third-party companies to interact with Fans. Defendants have knowingly participated in and facilitated this deceptive conduct.

231.    Plaintiffs and the Nationwide Class would not have made payments to Defendants or would have paid less if they had been aware that OnlyFans allowed third parties to impersonate Creators or that they were interacting with third parties instead of Creators.

232.    Defendants thus collected profits for their misrepresentation from Plaintiffs and the Nationwide Class.

233.    Defendants have knowledge or an appreciation of the benefit conferred upon them by Plaintiffs and members of the Nationwide Class.

234.    As a result of these actions, Defendants received benefits under circumstances where it would be inequitable, unfair, and unjust to retain these benefits.

235.    Defendants have been unjustly enriched.

236.    Plaintiffs and the Nationwide Class Members are entitled to restitution and/or disgorgement of all profits, benefits, and other compensation obtained and retained by Defendants as a result of their deceptive, misleading, and unlawful conduct.

## COUNT IV
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act:
Deceptive Practices
(On Behalf of Plaintiffs and the Illinois Subclass against Defendants)**

237.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

238.    Defendants' conduct described herein violates the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. Ann. §§ 505/1-505/12.

239. At all times relevant hereto, Plaintiffs and the Illinois Subclass members were either natural persons or their legal representatives, partnerships, corporations, companies, trusts, business entities, or associations. 815 Ill. Comp. Stat. 505/1(c).

240. At all times relevant hereto, Plaintiffs and Illinois Subclass Members were also "consumers" as defined by the ICFA because they purchased services from Defendants for their own personal use. 815 Ill. Comp. Stat. Ann. § 505/1(e).

241. The ICFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." 815 Ill. Comp. Stat. 505/2.

242. Defendants' misrepresentations and omissions as described herein constitute "unfair or deceptive practices" within the meaning of the ICFA. For example:

a.   Defendants deceived Plaintiffs and Illinois Subclass Members by misrepresenting to them that they were interacting with Creators directly on the OnlyFans website, when in fact they were interacting with third parties impersonating Creators.

b.   Defendants deceived Plaintiffs and Illinois Subclass Members by misrepresenting to them that when purchasing content and paying to send and receive direct messages, it was the Creator creating and publishing this content—when in fact it was third parties impersonating the Creator.

c.   Defendants deceived Plaintiffs and Illinois Subclass Members by omitting or suppressing the material fact that they might be communicating with unknown third parties impersonating Creators rather than the Creators themselves.

243.    Defendants intended that Plaintiffs and Illinois Subclass Members rely on these misrepresentations and omissions in creating accounts on the OnlyFans website and making purchases on the OnlyFans website.

244.    The misrepresentations and omissions described herein were material in that the identity of the individuals with whom they are interacting is the type of information upon which a reasonable consumer is expected to rely in making a decision to pay for communications or interactions on a social media website.

245.    Defendants' conduct described herein occurred in a course of conduct involving trade or commerce in Illinois, arose out of transactions that occurred in Illinois, and/or harmed individuals located in Illinois.

246.    Defendants engaged in such unlawful course of conduct with the intent to induce Plaintiffs and Illinois Subclass members to purchase content on the OnlyFans website and pay more than they would have paid had they known that the Creators they were paying to interact with engaged third parties to interact with Fans.

247.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Illinois Subclass Members were misled and/or deceived.

248.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Illinois Subclass Members were damaged in that they did not receive the benefit of their bargain.

249.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Illinois Subclass Members suffered damage in the form of economic loss in that they would not have paid for, or would have paid less for, Defendants' services had they been aware that they were or might be interacting with third party impostors, rather than the Creators themselves.

250.     Plaintiffs and the Illinois Subclass members seek all monetary and nonmonetary relief allowed by law, including injunctive relief, actual damages, punitive damages, and attorneys' fees and costs.

## COUNT V
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act:
Unfair Practices
(On Behalf of Plaintiffs and the Illinois Subclass against Defendants)**

251.     Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

252.     Defendants' conduct described herein violates the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. Ann. §§ 505/1-505/12.

253.     At all times relevant hereto, Plaintiffs and the Illinois Subclass members were either natural persons or their legal representatives, partnerships, corporations, companies, trusts, business entities, or associations. 815 Ill. Comp. Stat. Ann. § 505/1(c).

254.     At all times relevant hereto, Plaintiffs and Illinois Subclass Members were also "consumers" as defined by the ICFA because they purchased services from Defendants for their own personal use. 815 Ill. Comp. Stat. Ann. § 505/1(e).

255.     The ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to . . . the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965." 815 Ill. Comp. Stat. Ann. § 505/2.

256.     Defendants' acts and omissions described herein constitute unfair methods of competition and/or unfair acts or practices with respect to the content that Plaintiffs and Illinois Subclass Members purchased on the OnlyFans website in that Defendants unfairly represented that

Plaintiffs and Class Members could interact directly with Creators by spending money on the site when in fact those Creators engaged third parties to communicate with Fans.

257.    Defendants' acts or practices were "unfair" as they offend public policy, are immoral, unethical, oppressive, and unscrupulous.

258.    Defendants' acts or practices are immoral and unethical as they serve only to benefit Defendants to the detriment of the consuming public.

259.    Defendants intended that Plaintiffs and Illinois Subclass Members spend money on the OnlyFans website in reliance on these unfair acts and/or practices.

260.    The unfair acts and/or practices described herein were material in that the identity of the individuals with whom they are interacting is the type of information upon which a reasonable consumer is expected to rely in making a decision to pay for so-called authentic communications or interactions on a social media website.

261.    Defendants' conduct described herein occurred in a course of conduct involving trade or commerce in Illinois, arose out of transactions that occurred in Illinois, and/or harmed individuals located in Illinois.

262.    Defendants' acts or practices are also "unfair" because they were likely to cause, and did cause, substantial injury to consumers, as they resulted in Defendants receiving revenue to which they were not entitled.

263.    Defendants engaged in such unlawful course of conduct with the intent to induce Plaintiffs and Illinois Subclass members to purchase content on the OnlyFans website and pay more than they would have paid had they known that they were paying to interact not with specific Creators, but with third parties hired to interact with Fans.

264.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Illinois Subclass Members were damaged in that they did not receive the benefit of their bargain.

265.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Illinois Subclass Members suffered damage in the form of economic loss in that they would not have paid for, or would have paid less for, Defendants' services had they been aware that they were or might be interacting with third-party impostors, rather than the Creators themselves.

266.    The injuries caused by Defendants' acts or practices, namely consumers' monetary losses, are not outweighed by any countervailing benefit to consumers or competition. Defendants' unfair acts served no purpose other than to increase their own profits.

267.    Because Defendants misrepresented and omitted material information, these injuries were not reasonably avoidable.

268.    Plaintiffs and the Illinois Subclass members seek all monetary and nonmonetary relief allowed by law, including injunctive relief, actual damages, punitive damages, and attorneys' fees and costs.

## <u>COUNT VI</u>
### Illinois Common Law Fraud
### (On Behalf of Plaintiffs and the Illinois Subclass against Both Defendants)

269.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

270.    As described herein, Defendants made standardized false representations to Plaintiffs and Illinois Subclass members that, by making payments on the OnlyFans platform, they would be able to interact directly with Creators. For example:

a. OnlyFans' statement of its mission as "allow[ing] [Creators] to monetize their content while developing authentic relationships with their fanbase."

b. OnlyFans' representations throughout the Terms of Service that interactions are between Fans and Creators, and its stated prohibitions against misleading or deceptive conduct.

c. OnlyFans' representation in its Terms of Service that Creator earnings will be returned to Fans when Creators violate the Terms of Service, when in fact OnlyFans knowingly facilitates the violations.

271. As described herein, Defendants omitted, suppressed, and concealed, in their standardized representations to Plaintiffs and the Illinois Subclass members (including on the OnlyFans website, in the Terms of Service, and when soliciting and processing payments), the material fact that Creators with whom they paid to interact on the OnlyFans website engaged third parties to impersonate them and to interact with Fans such as Plaintiffs and class members.

272. Defendants made these representations and omissions knowingly or recklessly, as Defendants knew or should have known that Creators on OnlyFans, particularly the highest-earning Creators, regularly engage third parties to pose as the Creator for the purpose of deceptively communicating with Fans.

273. Defendants intended that their misrepresentations and/or omissions as to the ability of Fans to interact with Creators on the OnlyFans platform would induce consumers, including Plaintiffs and the Illinois Subclass, to spend money on the OnlyFans website.

274. Defendants knew that their misrepresentations and/or omissions were likely to induce Plaintiffs and Illinois Subclass Members to spend money on the OnlyFans website that they would not otherwise have spent.

275.    Defendants' misrepresentations and/or omissions were as to the type of information that a consumer would rely upon in deciding whether to spend money on a social media website: specifically, the identities of the individuals with whom they are paying to interact.

276.    Plaintiffs and Illinois Subclass Members justifiably relied on Defendants' misrepresentations and/or omissions as to Fans' ability to interact directly with Creators when they decided to spend money on the OnlyFans website to purchase subscriptions, send paid messages, and/or pay for PPV content on OnlyFans.

277.    Plaintiffs and Illinois Subclass Members would not have paid for, or would have paid less for, Defendants' services had they been aware that they were or might be interacting with third party impostors.

278.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Illinois Subclass Members were damaged in that they did not receive the benefit of their bargain.

279.    As a direct and proximate result of Defendants' conduct described herein, Plaintiffs and Illinois Subclass Members suffered damage in the form of economic loss in that they would not have paid for, or would have paid less for, Defendants' services had they been aware that they were or might be interacting with third-party impostors, rather than the Creators themselves.

280.    Plaintiffs and the Illinois Subclass members seek all monetary and nonmonetary relief allowed by law, including injunctive relief, actual damages, and punitive damages.

## COUNT VII
### Declaratory Judgment
### (On Behalf of Plaintiffs and Nationwide Class Against Defendants)

281.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

282. The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

283. As alleged above, Plaintiffs and Class Members seek a declaration that Defendants breached the contract and covenant of good faith and fair dealing between Plaintiffs and Class Members and Defendants by making representations to Plaintiffs and Class Members regarding the types of interactions that Plaintiffs and Class Members would be having with individual Creators while failing to enforce the Terms of Service and related documentation despite repeated and rampant violations of the Terms of Service and related documentation.

284. An actual, present, and justiciable controversy has arisen between Plaintiffs, Class Members, and Defendants concerning whether Defendants breached the contracts between Plaintiffs and Class Members and Defendants.

285. Plaintiffs and the Classes seek declaratory judgment from this Court that Defendants breached the contracts between Plaintiffs and the Classes and Defendants.

## VIII.   RELIEF REQUESTED

WHEREFORE, Plaintiffs, individually and on behalf of all other Class Members proposed in this Complaint, request that the Court enter judgment in their favor against Defendants and:

A.   Determine that this matter may proceed as a class action and certify the Classes/Subclasses as alleged herein;

B.   Appoint Plaintiffs as representatives of the Class/Subclasses alleged herein, and appoint Plaintiffs' counsel as Class counsel;

C.   Award Plaintiffs and the Class Members compensatory and consequential damages, as set forth above;

D.   Award Plaintiffs and the Class Members punitive damages, as set forth above;

E.   Award full restitution of all funds acquired from Defendants' unlawful conduct;

F.   Award injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein;

G.   For a declaration that Defendants were committing unfair and deceptive practices by engaging in the conduct alleged herein.

H.   Award Plaintiffs reasonable costs and attorneys' fees incurred in the prosecution of this action, as set forth above;

I.   Award pre-judgement and post-judgment interest, as provided by law or equity; and

J.   Grant such other relief as the Court may deem just and proper.

## IX.   JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: March 26, 2025

Respectfully submitted,

*/s/ Andrea R. Gold*
Andrea R. Gold (#6282969)
Shana Khader (#5015995)
David A. McGee*
**TYCKO & ZAVAREEI, LLP**
2000 Pennsylvania Avenue, NW
Suite 1010
Washington, DC 20006
Phone: (202) 973-0900
Facsimile: (202) 973-0950
Email: agold@tzlegal.com
Email: skhader@tzlegal.com
Email: dmcgee@tzlegal.com

Keith T. Vernon*
**TIMONEY KNOX, LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
Phone: (215) 646-6000
Facsimile: (215) 591-8246
Email: kvernon@timoneyknox.com

Andrew W. Knox*
**TIMONEY KNOX, LLP**
400 Maryland Drive
Fort Washington, PA  19034
Phone: (215) 646-6000
Facsimile: (215) 591-8246
Email: aknox@timoneyknox.com

Troy M. Frederick*
Beth A. Frederick*
**FREDERICK LAW GROUP PLLC**
836 Philadelphia Street
Indiana, Pennsylvania 15701
Phone: (724) 801-8555
Fax: (724) 801-8358
Email: TMF@FrederickLG.com
Email: BAF@FrederickLG.com

David M. Ferris*
Brian R. Charville*
**FERRIS & CHARVILLE, LLC**
118 Turnpike Road, Suite 300
Southborough, MA 01772
Phone: (508) 281-5600
Facsimile: (508) 229-0356
Email: david@ferrisdevelopment.com
Email: bcharville@ferrisdevelopment.com

Jonathan Shub*
**SHUB JOHNS & HOLBROOK ,LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA  19428
Phone: (610) 477-8380

Email: jshub@shublawyers.com

Robert B. Carey*
Leonard W. Aragon*
**HAGENS BERMAN SOBOL SHAPIRO LLP**
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Email: rob@hbsslaw.com
  leonarda@hbsslaw.com

*Counsel for Plaintiffs M. Brunner, J. Fry, and the Putative Class*

   * *Pro Hac Vice Admission*
    *Applications Forthcoming*